UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NORMAN RONNIE HANSEN, JR.,      )
                                )
            Plaintiff,           )
                                )
        v.                       )          No. 1:24-cv-00278-JAW
                                )
HOMESITE INSURANCE               )
COMPANY OF THE MIDWEST,          )
et al.,                          )
                                )
            Defendants.          )

**ORDER ON MOTION TO DISMISS**

In a dispute arising from a claim filed under a homeowners insurance policy that has not been paid, the insurance agent and its parent company move to dismiss the claims against them, asserting that this court lacks personal jurisdiction over the parent company and that the plaintiff has failed to state a claim for unfair claims practices against either the agent or its parent. Concluding that the parent company has no contacts with the state of Maine, such that the court lacks specific or general jurisdiction, and further that there is no basis for piercing the corporate veil to impute to the parent the conduct of its subsidiary, the court grants the motion to dismiss the parent company for lack of personal jurisdiction. The court also grants the motion to dismiss the insurance agent for failure to state a claim upon which relief may be granted, determining that the plaintiff has made no allegations regarding unfair claims practices against the insurance agent and has failed to establish a fiduciary duty in the state of Maine on insurance agents to advise an insured party as to the adequacy of his coverage.

## I.    PROCEDURAL HISTORY

On August 2, 2024, Norman Ronnie Hansen, Jr., a citizen of the state of Maine, filed a civil complaint in this Court against Homesite Insurance Company of the Midwest (Homesite), a business incorporated in the state of Delaware and with a principal place of business in the state of Wisconsin; American Family Insurance Claims Services (AFICS), a business incorporated and with a principal place of business in the state of Wisconsin; American Family Mutual Insurance Company S.I. (AmFam Mutual), a business incorporated and with a principal place of business in the state of Wisconsin; Government Employees Insurance Company (GEICO),[1] a business incorporated in the state of Delaware and with a principal place of business in the state of Maryland; and Berkshire Hathaway, Inc. (Berkshire), a business incorporated in the state of Delaware and with a principal place of business in the state of Wisconsin (collectively, the Defendants).[2]  *The Parties to This Compl.* at 1-2 (ECF No. 1) (*Compl.*); *Compl. for a Civil Case* at 5 (ECF No. 21) (*Corrected Compl.*). In his complaint, Mr. Hansen alleges that he "had Geico auto insurance and got my

---

[1]    Mr. Hansen names this party as Geico Insurance Company.  *See Compl. for a Civ. Case* at 5 (ECF No. 21) (*Corrected Compl.*).  In its motion to dismiss, this Defendant remarks there is no such entity and that it understands Plaintiff's suit to be brought against Government Employees Insurance Company (GEICO), of which GEICO Insurance Agency, LLC is a wholly owned subsidiary.  *See Defs. Berkshire Hathaway Inc.'s and Geico Ins. Co.'s Mot. to Dismiss for Lack of Pers. Jurisdiction and/or Failure to State a Claim* at 1 n.1 (ECF No. 28).  Assuming this Defendant knows its own name, the Court adopts Government Employees Insurance Company (GEICO) as this entity's proper name in this order.

[2]    Mr. Hansen's original complaint named only Homesite Insurance Company of the Midwest and American Family Insurance Claims Services as Defendants.  *Compl.* at 1.  However, in correspondence with the Court, Plaintiff recognized this filing was in error and filed a corrected complaint naming all Defendants.  *Correspondence* (ECF No. 20); *Compl. for a Civil Case* at 5 (ECF No. 21) (*Corrected Compl.*).  The United States Magistrate Judge issued a procedural order on September 19, 2024 recognizing this corrected complaint as "the operative pleading."  *Procedural Order* (ECF No. 19).

homeowners insurance through Geico in a 'bundle'" for his home in Bangor, Maine. *Corrected Compl.* at 5-6. After his home experienced significant damage in July 2023, he filed a claim with "Homesite Insurance Company of the Midwest, Geico's affiliate with whom they 'bundled' the home and automobile policy," and alleges Homesite has declined to approve, reject, or otherwise pay his claim to date. *Corrected Compl.* at 6-8.

Defendants Homesite, AmFam Mutual, and AFICS jointly moved for a more definite statement on September 18, 2024, asking the Court to order Mr. Hansen to submit an amended complaint with enumerated paragraphs and clarified allegations as to each respective Defendant so moving. *Defs. Homesite Ins. Co. of the Midwest, Am. Fam. Ins. Claims Servs., and Am. Fam. Mut. Ins. Co., S.I.'s Joint Mot. for More Definite Statement* (ECF No. 16). Mr. Hansen responded to the motion for more definite statement on October 8 and 9, 2024, submitting revised allegations and eighty-five attachments in support. *Answer to Defs. Homesite Ins. Co. of the Midwest, Am. Fam. Ins. Claims Servs., and Am. Fam. Mut. Ins. Co. S.I.'s Joint Mot. for More Defin[i]tive Statement* (ECF No. 23); *Additional Attachs.* (ECF No. 24); *Additional Attachs.* (ECF No. 25); *Additional Attachs.* (ECF No. 26). Homesite, AmFam Mutual, and AFICS jointly replied on October 22, 2024. *Defs. Homesite Ins. Co. of the Midwest, Am. Family Ins. Claims Servs., and Am. Fam. Mut. Ins. Co., S.I.'s Reply in Support of Joint Mot. for More Definite Statement* (ECF No. 27).

On November 14, 2024, the United States Magistrate Judge denied the motion for a more definite statement, concluding "Plaintiff's subsequent filings provide the

Moving Parties with sufficient detail regarding the bases of his claims," deeming "Plaintiff's response to the motion to be Plaintiff's operative pleading," and directing the Court Clerk "to docket the response (ECF No. 23) as Plaintiff's amended complaint." *Order on Mot. for More Definitive Statement* at 3-4 (ECF No. 29). The Clerk of Court entered Mr. Hansen's filing on the docket as an amended complaint that same day. *Answer to Defs. Homesite Ins. Co. of the Midwest, Am. Fam. Ins. Claims Servs., and Am. Fam. Mut. Ins. Co. S.I.'s Joint Mot. for More Defin[i]tive Statement* (ECF No. 30) (*Am. Compl.*).

Separately, Defendants Berkshire and GEICO (jointly, the Moving Defendants) moved on November 4, 2024 to dismiss the claims against them in the corrected complaint, *see Corrected Compl.*, for lack of personal jurisdiction over Berkshire and for failure to state a claim against either Moving Defendant. *Defs. Berkshire Hathaway Inc.'s and Geico Ins. Co.'s Mot. to Dismiss for Lack of Pers. Jurisdiction and/or Failure to State a Claim* (ECF No. 28) (*Moving Defs.' First Mot. to Dismiss*). Mr. Hansen responded opposing the motion to dismiss on November 22, 2024. *Resp. to Defs. Berkshire Hathaway Inc.'s and Geico Ins. Co.'s Mot. to Dismiss for Lack of Pers. Jurisdiction and/or Failure to State a Claim (Doc. 28)* (ECF No. 31) (*Pl.'s Opp'n*).

The Moving Defendants replied to their original motion to dismiss on December 4, 2024, informing the Court of their understanding that the subsequent amendment to the complaint had mooted their original motion to dismiss and asking the Court instead to consider the contents of their motion to dismiss the amended

complaint filed on November 25, 2024.  *Defs. Berkshire Hathaway Inc.'s and Geico Ins.'s* Reply *to Pl.'s Resp. to Defs. Berkshire Hathaway Inc.'s and Geico Ins. [Co.]'s Mot. to Dismiss fo[r] Lack of Pers. Jurisdiction and/or Failure to State a Claim* (ECF No. 36) (*Moving Defs.' First Reply*); *Defs. Berkshire Hathaway Inc.'s and Geico Ins. Co.'s Mot. to Dismiss Pl.'s Am. Compl. for Lack of Pers. Jurisdiction and/or Failure to State a Claim* (ECF No. 35) (*Moving Defs.' Second Mot. to Dismiss*).  In the second motion to dismiss, the Moving Defendants again assert a lack of personal jurisdiction over Berkshire and that Mr. Hansen had failed to state a claim against either Moving Defendant.  *Moving Defs.' Second Mot. to Dismiss.*

Mr. Hansen did not file a response to the Moving Defendants' second motion to dismiss within twenty-one days under District of Maine Local Rule 7.  D. ME. LOC. R. 7(b)(1).  However, in light of Mr. Hansen's pro se status and the atypical mechanism of his complaint's amendment, on March 10, 2025, the Court issued a preliminary order on the Moving Defendant's second motion to dismiss, instructing the Plaintiff "to file a response within fourteen days of this order, or inform the Court of his desire that the Court consider his response to the motion to dismiss the complaint as applicable to the motion to dismiss the amended complaint by the same deadline."  *Prelim. Order on Mot. to Dismiss* at 7 (ECF No. 43).

In compliance with the Court's directive, Mr. Hansen filed a response on March 24, 2025, asking the Court to consider his response to the first motion to dismiss as applicable to the Moving Defendant's second motion to dismiss.  *Res[p]. to Order (Doc. #43) Issued March 10, 2025* (ECF No. 44) (*Pl.'s Resp.*); *see also Resp. to Order (Doc.*

*#43) Issued March 10, 2025* (ECF No. 45) (correcting typographical errors).  In light of the Plaintiff's response, the Court dismissed the Moving Defendants first motion to dismiss as moot that same day.  *Order* (ECF No. 46).  The Moving Defendants replied to Mr. Hansen's response to their second motion to dismiss on April 7, 2025.  *Defs. Berkshire Hathaway Inc.'s and Geico Ins.'s Reply to Pl.'s Resp. to Defs. Berkshire Hathaway Inc.'s and Geico Ins. [Co.]'s Mot. to Dismiss fo[r] Lack of Pers. Jurisdiction and/or Failure to State a Claim* (ECF No. 52) (*Moving Defs.' Second Reply*).

## II.    FACTUAL BACKGROUND [3]

Mr. Hansen purchased a home located at 225 Forest Avenue in Bangor, Maine (the Property) on August 24, 2022, and resided there until August 4, 2023.  *Corrected Compl.* at 5-6; *Am. Compl.* at 2.  He reports that he obtained a homeowners insurance policy through GEICO in a bundle combining his automobile and home insurance; the policy, number 39352661, was through Homesite and covered the Property from September 7, 2022 through September 7, 2023.  *Am. Compl.* at 2.

---

[3]    As explained, the Magistrate Judge deemed Mr. Hansen's response to the motion for a more definite statement to be the operative pleading and directed the Clerk of Court to docket the response as the Plaintiff's amended complaint.  *See Order on Mot. for More Definitive Statement* at 3-4; *see also Am. Compl.*  Typically, once a complaint is amended, any earlier versions of the complaint cease to exist for the purposes of subsequent motions.  *See, e.g.*, *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 91 (1st Cir. 2008) ("An amended complaint, once filed, normally supersedes the antecedent complaint.  Thereafter, the earlier complaint is a dead letter and no longer performs any function in the case").  Here, though, Mr. Hansen drafted and submitted his motion not as an amended complaint, but as a more definite statement to supplement his corrected complaint, and his filing thus references the allegations of his corrected complaint in his attempt to expand upon them.  The Magistrate Judge logically treated Mr. Hansen's response as an amended complaint; however, in fairness to the Plaintiff, who did not move for his response to supersede the corrected complaint, the Court incorporates facts from his corrected complaint where they provide necessary context for the amended complaint's factual allegations.

Mr. Hansen traveled to Greece on July 23, 2023. *Id.* On the weekend of Saturday, July 29, 2023 through Monday, July 31, 2023, there were severe rainstorms in Bangor, Maine. *Id.* at 2-3. Sandi Richardson and her son, who were looking after Mr. Hansen's home while he was in Greece, called to inform the Plaintiff that "water was coming into the house, running down the walls and stairs, through the ceilings, soaking the carpets and pads, and there w[ere] a couple inches of water in the living room and water in the basement." *Id.* at 3. After the storms, Ms. Richardson discovered the source of the water; a roof hatch in the attic was open. *Id.* Ms. Richardson closed and secured the roof hatch, and then tried to clean up the water. *Id.*

On August 2, 2023, Ms. Richardson was in the kitchen when an individual, Edward Greenlaw, entered the house, and Ms. Richardson called the Bangor Police Department to report the break in. *Id.*; *Corrected Compl.* at 6. When police officers inspected the house, they found it unsafe due to the flooding and contacted the City of Bangor Code Enforcement, which condemned the house on August 4, 2023. *Am. Compl.* at 3. AFICS claims adjuster Dexter Greer used this August 4, 2023 date as the date of loss because that is when the house was condemned and the City of Bangor boarded up the front door; however, Mr. Hansen explains the rain event occurred earlier and he has provided the new claims adjuster, Jayne Beezley, with the dates of the rain events. *Id.* at 3-4.

The Plaintiff cancelled the remainder of his trip and returned to Bangor from Greece late in the evening on August 8, 2023; he filed a claim with Homesite on

August 10, 2023. *Id.* at 4; *Corrected Compl.* at 6. Mr. Hansen proceeded with efforts to secure the Property, including "put[ting] a hasp and lock on the hatch in the roof, chang[ing] the door locks, install[ing] a new roof (eliminating the hatch) and remov[ing] all of the carpet and pad as it was soaking wet." *Am. Compl.* at 4. A licensed and certified claims adjuster also arrived and prepared a report on the damage to Mr. Hansen's home. *Id.*

In response to Mr. Greer's request, Mr. Hansen sent him documents itemizing his expenses from August 3, 2023 through August 24, 2023, totaling $5,593.74, excluding the extra milage for the loss of use of his home. *Id.* Mr. Greer informed the Plaintiff that another department of AFICS would contact him to arrange temporary housing and provide money for expenses such as dining, gas for traveling to temporary accommodations, and a per diem. *Id.* at 4-5. Theodore Alfonsetti of Covenant Bridge Group later contacted the Plaintiff to request information on his expenses, *id.* at 5 (citing *id.*, Attachs. 4-50 (citations corrected)), but a representative of the department described by Mr. Greer did not contact the Plaintiff, despite Mr. Hansen calling multiple times and reaching a voicemail box. *Id.* Mr. Hansen also spoke with "Lilly Arndt, Josh, Savannah, and Shawn Henry who stated the claim was now 'elevated.'" *Id.* Mr. Hansen subsequently received a letter from Mr. Greer indicating he had been attempting to contact Mr. Hansen without success, despite no voicemails or emails being received by Mr. Hansen. *Id.* Eventually, Mr. Hansen discussed with Mr. Greer the requirements set by the City of Bangor, including the

required building permit, compliance with the 2022 building code, and Mr. Hansen's difficulties in obtaining a contractor's estimate of the damage. *Id.*

The City of Bangor required a building permit to begin the process of making the house livable again; Mr. Hansen submitted plans to the Bangor Code Enforcement Office and paid for the building permit. *Corrected Compl.* at 7. Mr. Hansen received a building permit on November 27, 2023, though the cost estimate on this permit is an underestimate due to Mr. Hansen's inability to obtain any estimate for repairs at that time. *Am. Compl.* at 5-6. The Plaintiff was simultaneously attempting to obtain estimates from local contractors; "[a]fter contacting every contractor in the area, [he] was unable to find one that was able to do the work." *Id.* at 6. The City of Bangor also mandates a licensed electrician rewire the entire house; even though the wiring in the home was functioning, the walls containing the wiring had become wet from the rainstorms, posing a fire hazard. *Id.*

Mr. Hansen has received eight letters from Mr. Greer and two letters from Ms. Beezley from August 14, 2023 through June 25, 2024, indicating they were not denying the claim, but rather investigating. *Id.* (citing *Additional Attachs.*, Attachs. 5-10 (ECF No. 25); *Additional Attachs.* (ECF No. 26); *id.*, Attachs. 1-3 (ECF No. 26) (citations corrected)). He has requested from Mr. Greer and Ms. Beezley a Sworn Statement in Proof of Loss form, as required under Maine law, numerous times since Ms. Beezley first mentioned that it was required in an email on July 23, 2024. *Id.* at 6-7. On August 2, 2024, Mr. Hansen submitted a notarized statement and related claims documents to Ms. Beezley, but in their last conversation in September 2024,

Ms. Beezley stated she was going to get an attorney to draw up a Sworn Statement in Proof of Loss; as of the date of filing the amended complaint, Mr. Hansen had not received the form. *Id.* at 7.

Mr. Hansen received a quote from a licensed electrician for work on his house, which he submitted to AFICS. *Id.* Ms. Beezley then called the Plaintiff, stating she was authorized to pay $48,800 for the claim and wished it to be taken care of. *Corrected Compl.* at 7. Mr. Hansen informed her that the bill for the required electrical work was going to be $35,000 and he had spent $20,000 to gut the house and $3,000 in dumpster fees, further explaining that there would be expenses relating to flooring and a fire escape required under the City of Bangor's building code. *Id.* She requested Mr. Hansen get an estimate for these additional expenses; he reported he has an estimate from Lee J. Bell for the work and would submit it to AFICS. *Id.* Further, he states he had to obtain a mortgage for $106,000 and had used up his retirement savings to pay for expenses. *Id.*

Mr. Hansen informs the Court that Ms. Beezley is apparently restarting the investigation; in a recent conversation, she requested the documentation previously provided to Mr. Alfonsetti a year earlier and the letters she has sent to Mr. Hansen are reportedly identical to those received a year earlier from Mr. Greer. *Am. Compl.* at 7. She also denied previously telling Mr. Hansen that she was authorized to pay $48,800 for the claim, stating "[she] could not have set that because it's above [her] limit," and that she could not provide a timeframe for the completion of her investigation. *Id.* She further stated that the house could not have been flooded

10

because there was not any rain during the week of August 4, 2023, to which Mr. Hansen explained the date Mr. Greer had used was the date of the condemnation and the rain event was from July 29 through July 31 of 2023. *Id.* Ms. Beezley further mentioned vandalism, to which Mr. Hansen responded there was none. He informed her that a vagrant had walked into his home uninvited, but nothing was subsequently missing or vandalized. *Id.* at 7-8.

## III.  THE PARTIES' POSITIONS

### A.    The Allegations in the Amended Complaint

Mr. Hansen brings a civil case against the Defendants, asserting federal jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332. *Corrected Compl.* at 3-4. Mr. Hansen alleges the insurance policy states the coverage limit for loss of use of the home is $131,700. *Am. Compl.* at 8 (citing *Additional Attachs.* at 3 (ECF No. 24) (*Ins. Policy*) (citation corrected)[4]). He has been without use of his home for fourteen months as of the time of filing and sent a list of his expenses to Mr. Greer on September 6, 2023 and Ms. Beezley on July 22, 2024. *Id.* (citing *Additional Attachs.*, Attach. 5, *Email re: Demand for Payment Claim* (ECF No. 25); *id.*, Attach. 7, *Expenses Spreadsheet* (ECF No. 25) (citation corrected)). Mr. Hansen directs the Court to the "Additional Living Expense" section of the insurance policy, which states:

> If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary

---

[4]    As the attachment containing the insurance policy contains multiple documents, each with internal pagination, the Court refers to page numbers as listed by the PDF software for the purposes of its citations in this order.

> increase in living expenses covered by you so that your household can
> maintain its normal standard of living.
>
> Payment will be for the shortest time required to repair or replace the
> damage or, if you permanently relocate, the shortest time required for
> your household to settle elsewhere.

*Id.* (citing *Insurance Policy* at 23 (citation corrected)).  Mr. Hansen reports that, as of

the date of filing, he has neither received any funds from Homesite for loss of use of

the "residence premises" where he resided, nor has he submitted any additional

expenses because Mr. Greer has not paid for the expenses from August 2023 or

requested an accounting of any expenses subsequent to that date, but instead

informed the Plaintiff that he would be paid a per diem rate.  *Id.* at 8-9.

> Mr. Hansen quotes a letter from Mr. Greer, sent on August 14, 2023, stating:
>
> Depending on the type and extent of the damages to your property, we
> may require a home inspection.  In that case, one of our field adjusters
> will contact you to schedule the inspection.  The field adjuster will create
> an estimate for damage to your property.  Your desk adjuster will
> compare the inspection estimate to your policy to determine if coverage
> is available for your damages.  If the loss is covered under the terms and
> conditions of your policy, then your desk adjuster will review a
> settlement with you and provide you with a copy of the estimate.

*Id.* at 9 (quoting *Additional Attachs.*, Attach. 5, *8/14/2023 Letter* (ECF No. 25)

(citation corrected)).  Mr. Hansen requested the field adjuster's name, a copy of his or

her report, and an estimate of the damage, but Mr. Greer responded that such

information is confidential and cannot be disclosed.  *Id.*  As of the date of filing, the

requested information had not been provided.  *Id.*  Mr. Hansen adds that in another

letter from Mr. Greer, sent on October 13, 2023, Mr. Greet stated he was completing

his investigation.  *Id.* at 9-10 (citing *Additional Attachs.*, Attach. 9, *10/13/2023 Letter*

(ECF No. 25) (citation corrected)).   However, Mr. Hansen submits he has since

received five more letters from AFICS stating his claim has not been denied and they were investigating. *Id.* at 9-10 (citing *Additional Attachs.*, Attachs. 10 (ECF No. 25); *Additional Attachs.* (ECF No. 26); *id.*, Attachs. 1-3 (ECF No. 26) (citations corrected)).

Mr. Hansen reiterates his allegation that, despite her subsequent denials, Ms. Beezely informed him she was authorized to pay $48,800 for his claim and that he responded by explaining the $35,000 electrical work bill, $20,000 bill to gut the house, $3,000 dumpster fee, and additional expenses related to flooring and the needed fire escape. *Id.* at 10. He insists she replied by asking him to provide an estimate and telling Mr. Hansen she wanted him "taken care of," but that she needed to follow management's instructions. *Id.* Mr. Hansen contends "[t]he clear allegation here is bad faith." *Id.*

Turning to the insurance policy, Mr. Hansen points out that the policy states, in a section describing exclusions, "We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not precluded by any other provision in this policy is covered." *Id.* (quoting *Ins. Policy* at 31 (citation corrected)). Thus, Mr. Hansen argues, even if the roof is not covered, "the resulting damages from the open hatch in the roof are covered under the policy." *Id.* at 10-11. However, he contends a conflict provision in the policy offers coverage for the roof; the "Duties After Loss" section states: "4. Protect the property from further damage. If repairs to the property are required, you must: a. Make reasonable and necessary repairs to protect the property; and [b.] Keep an accurate record of repair expenses." *Id.* at 11 (quoting *Ins.*

*Policy* at 32 (citation corrected)).  Mr. Hansen adds that these requirements were included in the letters from Mr. Greer and Ms. Beezley, respectively, *id.* (citing *8/14/2023 Letter*; *Additional Attachs.*, Attach. 3, *6/25/2023 Letter* (ECF No. 26) (citation corrected)), and contends he complied with such requirements by submitting an itemized list of ensuing damages.  *Id.* (citing *Expenses Spreadsheet*).  Mr. Hansen continues by describing in detail the damages to his home, the renovations made to address them, and why such renovations were the most cost-efficient means of doing so, including, inter alia, electrical work, gutting the building, stairwell foundation and utilities.  *Id.* at 11-13 (citing *Additional Attachs.*, Attach. 6, *Lee J. Bell Constr. Repair Estimate* (ECF No. 26)).

Mr. Hansen next addresses why AmFam Mutual was included in the complaint, pointing out that in American Family's Corporate Chart, "the Homesite Insurance Group of companies is under American Family, Inc. which falls under American Family Mutual Insurance Company S.I."  *Id.*  at 13 (citing *id.*, Attach. 51, *Am. Fam. Corp. Chart* (citation corrected)).  The Plaintiff notes that his corrected complaint includes claims against AFICS and states that its assets are $38,023,466.  *Id.* (citing *id.*, Attach. 52, *2023 Annual Rep.* (citation corrected)).  He continues that AFICS is not accredited by the Better Business Bureau, has been in business for seventy years, and has amassed thousands of complaints, many of which describe claims adjusters making promises that do not come to fruition.  *Id.* at 13-14 (citing *id.*, Attach. 53, *Better Bus. Bureau: Am. Family Ins.; id.*, Attach. 54, *Yelp: Homesite Ins.; id.*, Attach. 55, *Wallethub: Homesite Ins.; id.*, Attach. 56, *TrustPilot: Homesite*

*Ins.*; *id.*, Attach. 57, *Consumer Affairs: Homesite Ins. Reviews* (citations corrected)).

He explains that claimants receive letters that their claim is not denied and is under

investigation, before ultimately being denied or claimants being paid far less than

the actual damage. *Id.* He alleges the denials often occur immediately after the

deadline for filing a lawsuit. *Id.* at 14.

Mr. Hansen argues the liability of parent companies is governed by the ten

factors enumerated in *Fish v. East*, 114 F.2d 177 (10th Cir. 1940) (citation corrected),

which he sets forth as:

> (1) parent corporation owns all or majority of subsidiary's capital stock;
> (2) parent and subsidiary have common directors or officers; (3) parent
> corporation finances subsidiary; (4) parent corporation subscribes to all
> the capital stock of the subsidiary or otherwise causes its incorporation;
> (5) subsidiary has grossly inadequate capital; (6) parent corporation
> pays subsidiary's salaries, expenses or losses; (7) subsidiary has
> substantially no business except with the parent corporation or no
> assets except those conveyed to it by the parent corporation; (8) in parent
> corporation's papers, subsidiary is referred to as such or as a department
> or division; (9) directors or executives of the subsidiary do not act
> independently in the interest of the subsidiary but take direction from
> the parent corporation; (10) formal legal requirements of subsidiary as
> separate and independent corporation are not observed.

*Id.* He argues that the corporate organization charts of AmFam Mutual and AFICS

show officers serving in both entities in the same capacity and that each entity lists

the same address. *Id.* at 14-15 (citing *id.*, Attach. 58, *Am. Fam. Ins. Grp. – Co. Profile*;

*id*, Attach. 59, *Dirs. and Offs. of AFI MHS, AmFam Holdings, Inc., and Converted*

*AFMIC* (citations corrected)). Mr. Hansen next examines the financial statements of

the American Family Insurance Group, emphasizing that "[w]ithout access to the

workpapers for these financial statements, it isn't possible to determine the

commingling of assets of [AFICS] and [AmFam Mutual]." *Id.* at 15. He thus

15

concludes that "[t]hey are not operating as independent corporations; rather, as departments in the same building, and the policies stem from the same individuals acting as board members in [AFICS] and [AmFam Mutual]." *Id.* at 16.

The Plaintiff avers the reason for delays and inaction of claims adjusters in meeting their stated obligations cannot be determined without access to the board meeting minutes, and contends that, as in *Fish v. East*, "the instrumentality rule can be applied as many of the conditions are met and others are unanswered." *Id.* He continues that, in order to determine the facts, he needs to see:

> the complete claim file, which should include the name of the licensed public adjuster who assessed the damage on my property, the estimate of the damage, and the report from Theodore Alfonsetti, the investigator from The Covent Group. I will also need to see all of Mr. Greer's and Ms. Beezley's notes and communications, claims handling manuals and training materials, internal emails, and other communications related to claims goals, directives, and culture. Additionally, information on claims reserves, how they are set, and reasons for changes, including internal discussions with offshore reinsurance claims executives on how to reduce payments; the personnel files of my claims handlers and their supervisors, including the claims department goals, and the analysis of how departments and individuals are performing; documents related to performance evaluations and compensation structures, especially for claims and company executives; financial goals set by the parent company, specifically return on investment targets, cash flow analysis, and ownership stakes or investment in their partners; intercompany communications regarding claims processing, percentages of claims denied or approved, the time frame from when a claim is filed to when it is ultimately denied or approved after investigations are completed; and the percentage amount of the claim payouts in relationship to the amount the certified public claims adjuster's estimate of damage to the property.

*Id.* at 17-18.

As relief, Mr. Hansen requests the costs to repair the damage done to his home, storage of household items, and expenses for the loss of his home for fourteen months,

which includes the expenses related to living in motels, commuting, and eating meals outside of his home. *Id.* at 18. He further alleges mental anguish from trying to contact claims adjusters to no avail, receiving empty promises that are not fulfilled, and receiving ten letters stating only that they are investigating. *Id.* at 18-19. He submits AmFam Mutual intended to "'run out the time limit for filing a complaint' and then deny the claim, or somehow bully [him] into accepting $48,800.00 that Ms. Beezley said she was authorized to pay because I fear receiving nothing," and estimates the "the cost of a year of misery, being homeless at 71 years old, and dealing with [AFICS] he would ask for $1,000,000.00." *Id.* at 19.

### B.   The Moving Defendants' Motion to Dismiss the Amended Complaint

The Moving Defendants ask the Court to dismiss the Plaintiff's claims against each of them for lack of personal jurisdiction as to Berkshire pursuant to Federal Rule of Civil Procedure 12(b)(2), and also for failure to state a claim against both Berkshire and GEICO pursuant to Federal Rule of Civil Procedure 12(b)(6). *Moving Defs.' Second Mot. to Dismiss* at 1.

Offering their perspective of the case, the Moving Defendants direct the Court to the attached affidavit of Daniel J. Jaksich, the Vice President and Controller of Berkshire. *Id.* (citing *Moving Defs.' First Mot. to Dismiss*, Attach. 1, *Aff. of Daniel J. Jaksich in Support of Def. Berkshire Hathaway Inc.'s Mot. to Dismiss for Lack of Pers. Jurisdiction and/or for Failure to State a Claim* ¶ 1 (*Jaksich Aff.*)). Mr. Jaksich submits that Berkshire is a holding company that owns subsidiaries engaged in numerous business activities. *Id.* (citing *Jaksich Aff.* ¶ 4). Mr. Jaksich further attests

that Berkshire is a Delaware corporation with a principal place of business in Omaha, Nebraska; that it does not conduct any business in Maine; that is not registered to do business in Maine, nor does it have a registered agent in Maine or pay Maine taxes; that it neither maintains an office or has employees in Maine; that it owns or leases no property in Maine, nor does it have any personal property in the State; and finally, that it does not consent to personal jurisdiction in Maine. *Id.* (citing *Jaksich Aff.* ¶ 3-8). Further, Mr. Jaksich states Berkshire was not involved in the events alleged by Plaintiff, that it is not an insurance company, has not issued an insurance policy to Mr. Hansen, and was not involved in the adjustment of his claims for damages as a result of the events described in the amended complaint. *Id.* at 4-5 (citing *Jaksich Aff.* ¶ 14-15).

Addressing the Defendants' respective business relationships, Mr. Jaksich says Berkshire is the indirect parent company of GEICO Corporation, Government Employees Insurance Company, and GEICO Insurance Agency, LLC, but it does not have a corporate relationship with Homesite or AFICS. *Id.* at 5 (citing *Jaksich Aff.* ¶¶ 9, 11). The Moving Defendants emphasize that Mr. Hansen does not allege any involvement by Berkshire or GEICO in the events giving rise to this case, that either Moving Defendant had an insuring obligation for the alleged damage, or that either Moving Defendant was involved in the adjustment of his claim. *Id.* They also highlight that he does not allege either Moving Defendant "made any oral or written representations to Plaintiff in connection with his homeowners[] insurance coverage or in connection with the adjustment of his damage claims." *Id.*

Based on the foregoing, the Moving Defendants move to dismiss Berkshire as a defendant pursuant to Rule 12(b)(2). *Id.* at 6. They first submit that, if jurisdiction is contested via motion to dismiss, "the plaintiff bears the burden of demonstrating facts sufficient to establish personal jurisdiction over the defendant." *Id.* (citing *Dorf v. Complastik Corp.*, 1999 ME 133, ¶13, 735 A.2d 984). To meet his burden, the Moving Defendants say, "the plaintiff must make a *prima facie* showing of jurisdictional facts," which requires the plaintiff to "go beyond the pleadings and make affirmative proof." *Id.* (first quoting *Dorf*, 1999 ME 133, ¶14, 735 A.2d 984; then quoting *United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 987 F.2d 39, 44 (1st Cir. 1993)). The Moving Defendants aver that a federal court sitting in diversity applies the law of the state it sits, that Maine's long arm statute is coextensive to the Due Process Clause of the Fourteenth Amendment, and that Due Process can be satisfied through a showing of general or specific jurisdiction. *Id.*

The Moving Defendants argue that, here, Mr. Hansen has failed to satisfy his burden to show Berkshire falls within the reach of Maine's long arm statute because he has not alleged any facts to demonstrate Berkshire transacted any business in Maine, *id.* at 7-8 (citing *Jaksich Aff.* ¶¶ 5-10), nor that it owns or uses any real or personal property in Maine. *Id.* at 8 (citing *Jaksich Aff.* ¶ 4). Further, the Moving Defendants submit that Plaintiff has not established that Berkshire has sufficient minimum contacts with the state of Maine as would make an exercise of jurisdiction comport with traditional notions of fair play and substantial justice. *Id.* at 8-9 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

19

First, the Moving Defendants argue Mr. Hansen cannot meet the high burden of establishing this Court's general personal jurisdiction over Berkshire based on its activities in the state of Maine, which "is considerably more stringent" than the standard applied to specific jurisdiction. *Id.* at 9 (quoting *Platten v. HG Berm. Exempted Ltd.*, 437 F.3d 118, 138 (1st Cir. 2006)). The contacts of a wholly owned subsidiary do not provide a basis for general jurisdiction over a parent corporation. *Id.* (citing *Daimler AG v. Bauman*, 571 U.S. 117, 136 (2014)).

Second, they argue Mr. Hansen cannot establish specific jurisdiction over Berkshire, submitting that he has failed to show "a demonstrable nexus between the complaint's claims and the activities in the forum that properly may be attributed to the defendants" because Berkshire has no contacts with Maine and was not involved in the issuance of the policy or handing of the claim giving rise to this case. *Id.* at 10-11 (quoting *Williams v. Dragone Classic Motor Cars*, 2021 U.S. Dist. LEXIS 61082, *14 (D. Me. Mar. 30, 2021)). Further, the Moving Defendants say, Berkshire has neither voluntarily availed itself of the privilege of conducting business in Maine, nor could it reasonably foresee itself being haled into court to defend an action there. *Id.* at 11-12. Finally, for the same reasons, the Moving Defendants submit it would be unreasonable for the Court to assert personal jurisdiction over Berkshire under the "traditional notions of fair play and substantial justice" articulated by the Supreme Court in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980). *Id.* at 12 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 297).

Turning to its motion to dismiss the claims against each Moving Defendant for failure to state a claim pursuant to Rule 12(b)(6), the Moving Defendants contend Mr. Hansen has failed to satisfy his burden of pleading "enough facts to state a claim to relief that is plausible on its face." *Id.* at 13 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard similarly applies to pro se filings, despite the typically liberal construction applied by the courts to the same. *Id.* at 14 (citing *Cote v. Murphy*, 152 F. App'x 6, 7 (1st Cir. 2005) ("While a pro se complaint is held to less stringent standards than one drafted by an attorney, courts need not conjure up unpleaded facts to support conclusory allegations")).

Here, the Moving Defendants characterize Mr. Hansen's position as "presumably trying to hold Berkshire liable for a homeowner[]s insurance policy issued by an unrelated entity which was 'bundled' with a GEICO auto insurance policy simply because Berkshire is GEICO's indirect parent company." *Id.* However, they point out, he does not allege Berkshire or GEICO was his insurer; rather, he makes no specific claims against Berkshire besides as an indirect parent of GEICO and only alleges GEICO served as his insurance agent,[5] not underwriter. *Id.* at 14-15. The Moving Defendants reject Mr. Hansen's claim that GEICO and Homesite are affiliates—"they are not"—and asserts the only factual statement regarding GEICO

---

[5]    The Moving Defendants also point out again that Mr. Hansen brings his claims against Geico Insurance Agency, LLC, but makes no allegations against Government Employees Insurance Company, of which Geico Insurance Agency is a wholly owned subsidiary. *Id.* at 14-15. They acknowledge that Geico Insurance Agency served as Mr. Hansen's insurance agent. *Id.*

is that Mr. Hansen bundled his home and auto insurance through it. *Id.* at 15. They assert this allegation is insufficient to state a plausible claim to relief. *Id.*

At bottom, the Moving Defendants ask the Court to dismiss Mr. Hansen's claim against Berkshire for lack of personal jurisdiction and to dismiss his claims against both Berkshire and GEICO for failure to state a claim. *Id.*

## C.    Mr. Hansen's Opposition[6]

Mr. Hansen opposes the Moving Defendants' motion to dismiss, first contesting Berkshire's statement that it has no physical presence and does not file a tax return in Maine by citing *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018) (citation corrected). *Pl.'s Opp'n* at 1. In *Wayfair*, the Plaintiff submits, the Supreme Court "ruled that the state is now free to enforce its Remote Seller Compliance Law (SB 106), which requires out-of-state sellers with more than 200 taxable sales transactions delivered into South Dakota in a calendar year, or more than $100,000 in gross revenue from the same, to collect and remit sales tax." *Id.* at 2 (citing *Wayfair, Inc.*, 585 U.S. 162*)*. Mr. Hansen avers that in so doing, the Supreme Court overturned the physical presence rule of *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992) (citation corrected), by concluding "[n]exus therefore, exists without a physical presence; an internet connection may be sufficient, or a gross income of $100,000 creates a nexus." *Id.* The Plaintiff submits that both GEICO and Berkshire have an online presence and derive an income in Maine exceeding $100,000 annually. *Id.*

---

[6]    As previously noted, the Court considers Mr. Hansen's response to the original motion to dismiss, *Pl.'s Opp'n*, as an opposition to the Moving Defendants' motion to dismiss the amended complaint. *See Prelim. Order on Mot. to Dismiss*; *Pl.'s Resp.*

Mr. Hansen next responds to Mr. Jaksich's affidavit, pointing out that Mr. Jaksich states Berkshire has no day-to-day control or management of operations at GEICO, but admits to ownership of the entity. *Id.* at 2-3. The Plaintiff insists that, as GEICO owners, Berkshire owns the voting stock and appoints the Board of GEICO, and further that GEICO Board Members' compensation is tied to specific goals and objectives in their employment contracts. *Id.* at 3. Characterizing this compensation arrangement as "Management by Objective (MBO)," *id.*, Mr. Hansen contends "[e]ffectively, Berkshire controls the decision-making of its wholly owned subsidiary GEICO indirectly." *Id.* To resolve whether Berkshire falls within the jurisdiction of Maine's long arm statute, he submits, it is necessary "to see the employment contracts of GEICO management and board of directors, the business partnership agreement with Homesite, and the amount of float funneled back to Berkshire Hathaway from its subsidiaries like GEICO." *Id.*

Elaborating, Mr. Hansen explains "float" means the balance between the premiums collected and retained by GEICO and the reserves it holds for expected payouts; he alleges "GEICO provides Berkshire with billions of dollars in insurance float every year" that serves as "a costless loan" for reinvestment without the constraints of insurance regulations. *Id.* at 3-4. Mr. Hansen submits "[t]he float Berkshire had access to in 2022 was $164 billion, and in 2023, Q3, GEICO accounted for 2.4 billion of their operating profit," and calculates that "[i]f Maine residents account for 1% of the float Berkshire had access to in 2022, the interest savings at the current bank rate are 4.75% of 1.64 billion, approximately totaling 78 million

dollars." *Id.* at 4. Through this deductive reasoning, Plaintiff infers that Berkshire is purposely doing business in Maine and deriving income in excess of the threshold mentioned by the *Wayfair* Court, and "therefore, this court has general and specific jurisdiction" over Berkshire as a Defendant in this case. *Id.*

Mr. Hansen then recounts GEICO's corporate history, recalling Warren Buffett's substantial investment in GEICO stock in 1976 and informing the Court that the directors of GEICO were Mr. Buffett, Marc D. Hamburg, and Forrest N. Krutter. *Id.* at 4-5. He compares these with Berkshire's executive officers—Mr. Buffett, Charles T. Munger, and Mr. Hamburg—and its directors—Mr. Buffett, Mr. Munger, Howard G. Buffett, Malcolm G. Chace, William H. Gates, David S. Gottesman, Charlotte Guyman, Donald R. Keough, Thomas S. Murphy, Ronald L. Olson, and Walter Scott, Jr.—to argue that the same officers appear in both entities and assert "[i]t is widely known that these two entities are essentially the same company." *Id.* at 5.

Returning to the Moving Defendants' motion to dismiss, Mr. Hansen emphasizes that the Moving Defendants concede that Homesite is a business partner of GEICO without providing the business details of their partnership and argues that, as such, GEICO receives a commission from Homesite when it sells a Homesite homeowners policy bundled with its automobile insurance. *Id.* at 6. He extends this argument to Berkshire, asserting Berkshire receives substantial monetary benefit from policies sold as the owners of GEICO in the form of free loans. *Id.* He thus submits, "[a]lthough Berkshire [] has no offices or has no offices or staff in Maine, and

doesn't file a tax return in the state, it derives income from policies that are sold within the state of Maine" such that the Court has personal jurisdiction over Berkshire. *Id.*

Furthermore, Mr. Hansen argues "[i]nsurance agencies have a clear obligation to provide a homeowner[]s policy that will fulfill its obligations" and that this obligation extends to GEICO by virtue of GEICO selling him a Homesite policy to cover his home. *Id.* He questions what due diligence GEICO performed in choosing to partner with Homesite and what financial incentive there is to GEICO in selling such a policy, and alleges "GEICO is acting in the capacity of an insurance agent, not merely as a broker, because GEICO regularly bundles Homesite homeowners[] policies with its automobile policies." *Id.* at 6-7. Therefore, the Plaintiff says, GEICO "has the fiduciary duty to procure insurance that the consumer can rely on in the event of a disaster," and failed to satisfy this duty by selling Homesite policies despite a record of complaints against it for noncompliance with insurance regulations. *Id.*

Reiterating the factual underpinning of his claims, Mr. Hansen submits Homesite's and AFICS's conduct violates 24-A M.R.S. § 2164-D as an unfair claims practice by "[k]nowingly misrepresenting to claimants and insureds relevant facts or policy provisions," "[f]ailing to acknowledge with reasonable promptness pertinent written communications with respect to claims arising under its policies," "[f]ailing to adopt and implement reasonable standards for the prompt investigation and settlement of claims," "[f]ailing to develop and maintain documented claim files supporting decisions made regarding liability," "[r]efusing to pay claims without

conducting a reasonable investigation," "[f]ailing to affirm coverage or deny coverage, reserving any appropriate defenses, within a reasonable time after having completed its investigation related to a claim," "[u]nreasonably delaying the investigation or payment of claims by requiring both a formal proof of loss and subsequent verification when subsequent verification would result in duplication of information appearing in the formal proof of loss," "[f]ailing in the case of claims denials or offers of compromise settlement, to promptly provide an accurate written explanation of the basis for those actions," and by "[f]ailing to provide forms, accompanied by reasonable explanations for their use, necessary to present claims within 15 calendar days of such a request." *Id.* at 10 (quoting 24-A M.R.S. § 2164-D(3)(A-F), (I-K)). Mr. Hansen continues that Homesite and AFICS engaged in unfair claims practices by compelling an insured to institute a suit to recover the amounts due under its policies by, as a general business practice, offering substantially less than the amounts ultimately recovered in suits brought against it in violation of 24-A M.R.S. § 2164-D(4), and by failing to deal with the insured in good faith to resolve claims without just cause as a general business practice in violation of 24-A M.R.S. § 2164-D(5). *Id.* at 10-12.

The Plaintiff insists GEICO "was clearly negligent in not providing [him] with a homeowners policy that could be relied upon." *Id.* at 12. He reports the Moving Defendants' counsel told him Homesite "just 'popped up' on GEICO's computer system," but alleges GEICO's criteria in selecting suitable business partners is not ascertainable and infers the low standard it uses is financially motivated. *Id.* He submits GEICO is obligated to provide its customers with policies underwritten by

trustworthy companies, citing caselaw interpreting state laws in New Jersey, Louisiana, and Idaho. *Id.* at 12-13. Mr. Hansen concludes that GEICO is selling policies from its business partner Homesite that are causing financial harm to policyholders, and that Berkshire is benefitting financially from GEICO's activities, such that the Court should deny the Moving Defendants' motion to dismiss for lack of personal jurisdiction and failure to state a claim. *Id.* at 13-14.

### D. The Moving Defendants' Reply

The Moving Defendants' reply first asserts that the Plaintiff bears the burden of showing by a preponderance of the evidence that personal jurisdiction exists, *Moving Defs.' Second Reply* at 2 (citing *Adams v. Adams*, 601 F.3d 1, 4 (1st Cir. 2010)), and that, under the prima facie standard applicable to a motion to dismiss for lack of personal jurisdiction, the Court need not credit "conclusory allegations or draw farfetched inferences" but instead should rely only "on evidence of specific facts set forth in the record." *Id.* (quoting *Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 257 (1st Cir. 2022)). The Plaintiff may go beyond the pleadings to proffer affirmative proof, which the Court accepts as true for the purpose of determining the prima facie jurisdictional showing. *Id.* (citing *Foster-Miller v. Babcock & Wilcox Can.*, 46 F.3d 138, 145 (1st Cir. 1995)).

Here, the Moving Defendants submit Mr. Jaksich's declaration establishes "that Berkshire has no connection to Maine, does not conduct business in Maine, has no registered agent in Maine, does not maintain an office in Maine, own or lease any real estate in Maine or have any personal property in Maine," and point out that Mr.

Hansen has neither disputed these assertions nor submitted any other evidence to contradict these statements. *Id.* at 2-3. Instead, the Moving Defendants say, Mr. Hansen argues personal jurisdiction exists over Berkshire because "GEICO and Berkshire have an online presence," *id.* at 3 (quoting *Pl.'s Opp'n* at 2 (citation corrected)), and based on his unsupported allegation that GEICO and Berkshire conduct more than $100,000 in sales in the state of Maine. *Id.*

The Moving Defendants next contest the relevance of Plaintiff's citation to *South Dakota v. Wayfair, Inc.*, 585 U.S. 162, arguing that *Wayfair*'s "central dispute is whether South Dakota may require remote sellers to collect and remit the tax without some additional connection to the State," *id.* at 3-4 (quoting *Wayfair*, 585 U.S. at 177), which the Moving Defendants distinguish from the Plaintiff's purported proposition that having an online presence constitutes physical presence in a state. *Id.* Instead, the Moving Defendants submit the scope of personal jurisdiction is guided by *Chen v. United States Sports Academy, Inc.*, 956 F.3d 45 (1st Cir. 2020), in which the First Circuit held that the "mere availability of a defendant's primarily informational website in a forum is insufficient, without more, to subject a defendant to jurisdiction there. Otherwise, the universality of websites in the modern world would overwhelm constitutional limitations on the exercise of personal jurisdiction." *Id.* at 4 (quoting *Chen*, 956 F.3d at 56).

Responding to Mr. Hansen's allegations that the directors and owners of Berkshire and GEICO overlap and these entities should thus be considered the same, the Moving Defendants collect First Circuit caselaw supporting the proposition that

28

parent companies and their subsidiaries are legally distinct, such that jurisdiction over the subsidiary does not confer jurisdiction over the parent. *Id.* (citing *Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (holding that the "mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary"); *Gonzalez v. Walgreens Co.*, 878 F.2d 560, 561 (1st Cir. 1989) ("a parent company may not be subject to jurisdiction merely because its subsidiary resides in the forum"); *Donatelli v. Nat. Hockey League*, 893 F.2d 459, 465 (1st Cir. 1990) ("In general, the courts have presumed the institutional independence of parent and subsidiary when determining whether jurisdiction may be asserted over the parent solely on the basis of the subsidiary's contacts with the forum")).

The Moving Defendants argue the presumption of corporate separateness "must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary, *id.* at 5 (quoting *Escude Cruz*, 619 F.2d at 905), and "individuals on the boards of [a parent's] subsidiaries and vague allegations of control will not suffice to meet plaintiff's burden." *Id.* (quoting *Amburgey v. Atomic Ski, USA, Inc.*, No. 2:06-CV-149-GZS, 2007 U.S. Dist. LEXIS 36424, at * 18-19 (D. Me. May 17, 2007)). Rather, the level of control of a parent must render the subsidiary "a mere shell." *Id.* (quoting *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 161 (1st Cir. 2022)). The Moving Defendants contend Mr. Hansen has provided no evidentiary proof that Berkshire has exercised such control over GEICO. *Id.*

More importantly, the Moving Defendants argue, is that Mr. Hansen has presented no evidence in support of his factual allegations or legal support for his analysis. *Id.* In this Circuit, they say, "it has long been the rule…that plaintiffs may not rely on unsupported allegations in their pleadings to make a *prima facie* showing of personal jurisdiction." *Id.* (quoting *Boit v. Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir. 1992)).

Turning from their jurisdictional argument to their request for dismissal for failure to state a claim, the Moving Defendants emphasize that Mr. Hansen's amended complaint "contains **no** mention of Berkshire and mentions GEICO only as follows: "'I obtained my homeowner[]s policy through Geico Insurance Company in a bundle combining my auto and home. The policy Geico obtained for me was through Homesite Insurance Company of the Midwest . . .."" *Id.* (quoting *Am. Compl.* at 2 (citation corrected) (Moving Defendants' emphasis)). Mr. Hansen's citations to attached copies of the insurance documents confirm his homeowners insurance policy was underwritten and provided through Homesite. *Id.*

Despite acknowledging that Homesite was his property insurer and that GEICO acted as his agent, the Moving Defendants submit, Mr. Hansen cites obligations associated with an insurer under the Maine Insurance Code to allege Homesite's actions violated the law. *Id.* at 5-6. However, the Moving Parties argue neither GEICO nor Berkshire meets the statutory definition of an insurer, which Maine law defines as "every person engaged [a]s a principal and as indemnitor, surety or contractor in the business of entering into contracts of insurance." *Id.* at 6 (quoting

24-A M.R.S. § 4). Further, they say, Mr. Hansen has not alleged either Berkshire or GEICO was involved in the handling of his property insurance claim; rather, all allegations of unfair claims practices in the amended complaint are made against Homesite, AFICS, and AmFam Mutual. *Id.*

The Moving Defendants characterize Mr. Hansen's argument to be asserting that the Moving Defendants breached their fiduciary duties by "offering GEICO customers the option to bundle their auto insurance with a home insurer that Plaintiff believes to be subpar based on references to online customer complaints." *Id.* The Moving Defendants respond that an insurance agent "generally assumes only those duties found in an ordinary agency relationship, that is, to use reasonable care, diligence and judgment in obtaining the insurance coverage requested by the insured party." *Id.* at 7 (quoting *Szelenyi v. Morse, Payson & Noyes Ins.*, 594 A.2d 1092, 1094 (Me. 1991)). An insurance agent does not, however, have "a duty to advise an insured about adequacy of coverage merely because an agency relationship exists between the parties. Before such a duty can arise, a special agency relationship must exist between the parties." *Id.* (citing *Szelenyi*, 594 A.2d at 1094). The Moving Defendants submit that Mr. Hansen has not alleged any special relationship exists between him and either GEICO or Berkshire, and thus reiterates its request that the Court enter an order granting their motion to dismiss. *Id.*

## IV. LEGAL STANDARDS

### A. Motion to Dismiss for Lack of Personal Jurisdiction

#### 1. Standard for Personal Jurisdiction

To hear a case, a court must have personal jurisdiction over the parties; "that is, the power to require the parties to obey its decrees." *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999). The plaintiff bears the burden of persuading the court that personal jurisdiction over each defendant exists. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *accord Mass. Sch. of Law at Andover, Inc. v. Amer. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998).

When sitting in diversity jurisdiction, as this Court does here, a federal court serves as "the functional equivalent of a state court sitting in the forum state." *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 24 (1st Cir. 2005) (internal quotation omitted). Thus, to establish personal jurisdiction over the Defendants, Mr. Hansen must establish that Maine's long-arm statute permits an exercise of jurisdiction and that doing so would not offend the Due Process Clause of the United States Constitution. *Id.* However, because Maine's long-arm statute extends "to the fullest extent permitted by the due process clause of the United States Constitution," 14 M.R.S. § 704-A(1), the two inquiries merge as functionally coextensive. *See, e.g.*, *Harlow v. Children's Hosp.*, 432 F.3d 50, 57 (1st Cir. 2005); *Elec. Media Int'l v. Pioneer Commc'ns of Am., Inc.*, 586 A.2d 1256 (Me. 1991). The limits of the Fourteenth Amendment's Due Process Clause thus determine the extent of the Court's personal

jurisdiction in the present action.  *See Henderson v. Laser Spine Inst. LLC*, 815 F. Supp. 2d 353, 367 (D. Me. 2011).

For a defendant not present within the forum—here, within the state of Maine—due process requires "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 9 (1st Cir. 2009) (quoting *Int'l Shoe Co.*, 326 U.S. at 319).  Sufficient minimum contacts can be established through two means.  First, a non-resident defendant may be subject to "general jurisdiction" for a "cause of action [which] may be unrelated to the defendant's contacts, [when] the defendant [has] continuous and systematic contacts with the state."  *Lechoslaw v. Bank of Am., N.A.*, 618 F.3d 49, 54 (1st Cir. 2010) (quoting *Harlow*, 432 F.3d at 57).

Alternatively, a non-resident defendant may be subject to "specific jurisdiction" "where the defendant[] availed [itself] of the opportunity to do business in the state, the claim in question is related to that access and the so-called gestalt factors are consistent with requiring an out-of-state defendant to defend within the state."  *N. Am. Catholic Educ. Programming Found., Inc., v. Cardinale*, 567 F.3d 8, 16 (1st Cir. 2009).  The First Circuit has explained the so-called "Gestalt factors" as assessing the reasonableness of exercising personal jurisdiction over a non-resident defendant based on:

> (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the

common interests of all sovereigns in promoting substantive social
policies.

*United Electrical, Radio & Machine Workers of Am. v. 163 Pleasant St. Corp.*, 960
F.2d 1088 (1st Cir. 1992) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477
(1985); *see also Donatelli v. National Hockey League*, 893 F.2d 459, 462-65 (1st Cir.
1990) (calling these five criteria the "Gestalt factors").

###    2.    Evidentiary Standard Applicable to a Rule 12(b)(2) Motion

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may assert by
responsive motion that the court should dismiss the plaintiff's claims against the
defendant for "lack of personal jurisdiction" over the defendant.  FED. R. CIV. P.
12(b)(2).

In considering a motion to dismiss for lack of personal jurisdiction, a district
court "may choose from among several methods for determining whether the plaintiff
has met [its] burden." *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007) (quoting
*Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50-51 (1st
Cir. 2002)).  Specifically, a district court selects between "a trio of standards, each
corresponding to a level of analysis, that might usefully be employed when a trial
court comes to grips with a motion to dismiss for want of personal jurisdiction."
*Foster-Miller, Inc.*, 46 F.3d at 145.  Those available standards are prima facie,

preponderance of the evidence,[7] and likelihood of existence of necessary facts.[8]  *Id.*

For the present motion, the Court applies the prima facie standard as the "most

conventional" and "a useful means of screening out cases in which personal

jurisdiction is obviously lacking." *Id.*

Under the prima facie standard, a district court considers "only whether the

plaintiff has proffered evidence that, if credited, [is] enough to support findings of all

facts essential to personal jurisdiction." *Id.* (internal quotation marks omitted).  The

court "accept[s] the plaintiff's (properly documented) evidentiary proffers as true for

the purpose of determining the adequacy of the prima facie jurisdictional showing"

and "construe[s those proffers] in the light most congenial to the plaintiff's

---

[7]    Under the preponderance of the evidence standard, a court must "embark on a factfinding mission in the traditional way, taking evidence and measuring the plaintiff's jurisdictional showing." *Foster-Miller*, 46 F.3d at 145.  A court lacks personal jurisdiction over a defendant when it:

> determines that in the circumstances of a particular case it is unfair to force an out-of-state defendant to incur the expense and burden of a trial on the merits in the local forum without first requiring more of the plaintiff than a prima facie showing of facts essential to in personam jurisdiction.  A court may so determine, for example, when the proffered evidence is conflicting and the record is rife with contradictions, or when a plaintiff's affidavits are "patently incredible[.]"

*Id.* at 145-46 (quoting *Boit*, 967 F.2d at 676). The First Circuit has warned that the preponderance of the evidence standard "must be used discreetly" on a motion to dismiss for lack of personal jurisdiction because it requires "a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial." *Id.* at 146.

[8]    Under the "likelihood standard," a court asks "whether the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Foster-Miller*, 46 F.3d at 146 (quoting *Boit*, 967 F.2d at 676).  The First Circuit described the "likelihood standard" as "a middle course" between prima facia and preponderance of the evidence and instructed it may be applicable:

> [i]n the special circumstance in which the assertion of jurisdiction is bound up with the claim on the merits, the possibility of preclusion renders use of the preponderance standard troubling, while the possibility of permitting a dubious case to proceed beyond the pleading stage, and even to trial, though the court eventually will be found to lack jurisdiction, renders use of the prima facie standard undesirable.

*Id.* at 145-46.

jurisdictional claim." *Id*. (internal quotation marks omitted). The Court also considers facts put forward by the Defendant but "only to the extent that they are uncontradicted." *Id.*

## B.    Motion to Dismiss for Failure to State a Claim

### 1.    Standard for Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To state a claim, a complaint must contain, at minimum, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). In other words, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Plausible means "'something more than merely possible' or 'merely consistent with a defendant's liability.'" *Germanowski v. Harris*, 854 F.3d 68, 71-72 (1st Cir. 2017) (internal citation omitted) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)); *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 11 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Evaluating the plausibility of a claim is a "'context-specific' job that compels [judges] 'to draw on' [their] 'judicial experience and common sense.'" *Schatz*, 669 F.3d at 55 (quoting *Iqbal*, 556 U.S. at 679).

36

### 2.    Evidentiary Standard Applicable to a Rule 12(b)(6) Motion

Federal Rule of Civil Procedure 12(b)(6) authorizes a defendant to assert, in the responsive pleading, that the plaintiff's complaint should be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).

The Court's review of a motion to dismiss for failure to state a claim is a "two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)); *see also Schatz*, 669 F.3d at 55 (stating that a court may "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements"). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *García-Catalán*, 734 F.3d at 103 (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011)).

## V.    DISCUSSION

The Moving Defendants ask the Court to dismiss Berkshire for lack of personal jurisdiction under Rule 12(b)(2) and to dismiss both Berkshire and GEICO for failure to state a claim against them under 12(b)(6). *Moving Defs.' Second Mot. to Dismiss* at 1. Mr. Hansen asserts the Court has specific and general jurisdiction over Berkshire and that he has stated a cognizable claim for unfair claims practices

pursuant to 24-A M.R.S. § 2164-D against each Moving Defendant. As this Court cannot act in an absence of jurisdiction, in this order, the Court considers first whether Plaintiff has established the Court's personal jurisdiction over Berkshire and, second, whether he has stated a claim upon which relief can be granted against GEICO and, if the Court's jurisdiction is proven, Berkshire.

### A.    Motion to Dismiss Berkshire for Lack of Personal Jurisdiction

The Court understands Mr. Hansen's position to be that the Court has personal jurisdiction over Berkshire, in part, based on its alleged control over and profits derived from GEICO. As such, Plaintiff implicates the legal doctrine of piercing the corporate veil by attributing the conduct of GEICO to Berkshire for the purposes of determining jurisdiction and attributing liability. The Court thus addresses, as a preliminary matter, the propriety of piercing the veil with respect to Berkshire before turning to whether Mr. Hansen has demonstrated the Court's personal jurisdiction over Berkshire in this case.

### 1.    Piercing the Corporate Veil

"There is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary." *Escude Cruz*, 619 F.2d at 905. Under Maine law, "[a] court may pierce the corporate veil if a plaintiff establishes that: (1) the defendant abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *State v. Weinschenk*, 2005 ME 28, ¶ 19, 868 A.2d 200 (Me. 2005).

Here, Mr. Jaksich's declaration plainly states that Berkshire is the indirect parent company of GEICO, does not exercise day-to-day-control or management over GEICO's operations, and is not involved in the daily business activities of GEICO. *Jaksich Aff.* at 2-3. Nonetheless, Mr. Hansen argues "[e]ffectively, Berkshire controls the decision-making of its wholly-owned subsidiary GEICO indirectly" based on Berkshire's ownership of GEICO's voting stock, its appointment of the GEICO Board members and overlap with Berkshire's own Board members, and incentives in the employment contracts of GEICO management. *Id.* at 3. For the reasons explained here, Court concludes these allegations fail to constitute an abuse of the privilege of a separate corporate entity.

First, longstanding precedent in the First Circuit holds that a parent company's ownership of a subsidiary is not sufficient to extend a state's jurisdiction over a nonresident parent. *See Escade Cruz*, 619 F.2d at 17 ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is sole owner of the subsidiary"). This District Court has previously extended the holding of *Escade Cruz* from direct corporate owners to also apply to parent holding companies of independent corporations. *See Amburgey*, 2007 U.S. Dist. LEXIS 36424 at *17.

Here, Mr. Jaksich clearly stated that "Berkshire [] is a holding company which owns subsidiaries engaged in a number of business activities" and that "Berkshire [] is the indirect parent company of GEICO Corporation, which in turn owns[] Government Employees Insurance Company (GEICO), which in turn owns GEICO

Insurance Agency, LLC as a wholly owned subsidiary." *Jaksich Aff.* at 1-2.  Mr. Hansen has presented no evidence to the contrary that would evidence direct ownership of GEICO by Berkshire.  Following the jurisprudence of this Circuit and District, the Court concludes that, for the purposes of asserting personal jurisdiction, the indirect ownership of GEICO by Berkshire as a parent holding company is an insufficient basis to pierce the veil and attribute the conduct of GEICO to Berkshire.

Next, Mr. Hansen points out that several GEICO officers—specifically, Mr. Buffett and Mr. Hamburg—also serve as executive officers and directors at Berkshire and, further, argues Berkshire's ownership of GEICO's voting stock functionally permits an exercise of control by supervising the appointment of GEICO's corporate officers.  *Pl.'s Opp'n* at 5.  However, considering much the same allegations of a parent company's executives serving in officer roles of its subsidiary, the *Amburgey* Court concluded "a parent corporation's placement of individuals on the boards of its subsidiaries and Plaintiffs' unsupported and vague allegations of control fall far short of the clear and convincing evidence required to pierce the corporate veil." *Amburgey*, 2007 U.S. Dist. LEXIS 36424 at *18-19.  Without evidence on the record to support Mr. Hansen's accusations of Berkshire's illicit control or failure to comport with corporate formalities, the Court sees no basis in the case at bar to depart from is prior conclusion in *Amburgey* by overcoming the presumption of corporate separateness.

Relatedly, Mr. Hansen alleges that GEICO's Board members and management are indirectly controlled by Berkshire by virtue of so-called MBO, which he describes as "specific goals and objectives outlined in their employment agreements" that make

such employees beholden to Berkshire, rather than GEICO.  *Pl.'s Opp'n* at 3. However, Plaintiff neither alleges with any specificity what contractual incentives are included that would lead the Court to reasonably conclude that Berkshire operates day-to-day control over GEICO, nor does he provide any evidence to support his claims of improper MBO.  In light of this Circuit's recognition of a "presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary," *Escude Cruz*, 619 F.2d at 905, the Court concludes Mr. Hansen has failed to satisfy his burden of proving Berkshire abused the privilege of a separate corporate identity by exercising direct control over GEICO.

Further, even if Mr. Hansen had demonstrated Berkshire's abuse of the corporate form, he has presented no basis for the Court to conclude that "an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Weinschenk*, 2005 ME 28, ¶ 19, 868 A.2d 200.  Plaintiff does not allege, for example, that GEICO is insolvent or lacks sufficient funds to cover the potential liabilities relating to this case, as would provide a justifiable reason for piercing the corporate veil.  *Cf. Theberge v. Darbro Inc.*, 684 A.2d 1298, 1301 (Me. 1996) (holding courts may pierce the corporate veil if: (1) the corporation is a mere "alter ego" and (2) "when necessary in the interest of justice").  The Moving Defendants do not seek to dismiss Mr. Hansen's claim against GEICO for lack of personal jurisdiction, nor does the Court see any other reason that Mr. Hansen does not have full opportunity to assert his rights by bringing his claim against GEICO directly as the insurance agent in this dispute.

For these reasons, the Court declines to pierce the corporate veil by attributing the conduct of GEICO to Berkshire.  Despite Mr. Hansen's assertion that "[i]t is widely known that these two entities are essentially the same company," this Court's conclusion accords with other federal courts which have declined to exercise personal jurisdiction over Berkshire based on the actions of GEICO.  *See, e.g.*, *Willis v. Gov't Emps. Ins. Co.*, No. 13-280 KG/KK, 2016 U.S. Dist. LEXIS 189391, at *16 (D.N.M. Feb. 1, 2016) ("Berkshire's dealings with GEICO to encourage profits do not provide a basis for general personal jurisdiction over Berkshire"); *accord Gov't Emps. Ins. Co. v. Fred Javier Gonzalez Ins. Agency*, No. CV 09-6270-GHK (Ex), 2010 U.S. Dist. LEXIS 148481, at *4 (C.D. Cal. Dec. 27, 2010) (concluding the record provided "says nothing about the degree of control exercised by Berkshire Hathaway over these subsidiaries and there is no argument at all that it would result in fraud or injustice not to impute the subsidiaries' actions to Berkshire Hathaway").

## 2.    Specific Jurisdiction

Mr. Hansen bases his assertion of the Court's personal jurisdiction over Berkshire on two asserted contacts with the state of Maine: "an online presence" and "income in Maine significantly exceeding the $100,000 threshold for nexus."  *Pl.'s Opp'n* at 2.  He explains his allegation of $100,000 in revenue as deriving from the "billions of dollars in insurance float" that GEICO provides to Berkshire each year, performing back-of-the-napkin calculations to estimate, based on Berkshire's access in 2022 to $164 billion in float, that "[i]f Maine residents account for 1% of the float

Berkshire had access to in 2022, the interest savings at the current bank rate are 1.64 billion, approximately 78 million dollars." *Id.* at 4.

The First Circuit has divided the specific jurisdiction analysis into three inquires: (1) purposeful availment, (2) relatedness, and (3) reasonableness. *See N. Am. Catholic Educ. Programming Found., Inc.*, 567 F.3d at 16; *accord Henderson*, 815 F. Supp. 2d at 368. Based on Supreme Court and First Circuit holdings, the plaintiff bears the burden of persuading the court that personal jurisdiction over each defendant exists. *See McNutt*, 298 U.S. at 189; *Mass. Sch. of Law at Andover, Inc.*, 142 F.3d at 34. The Court thus considers whether Mr. Hansen has established each element for specific jurisdiction over Berkshire as a defendant in the state of Maine.

### a.    Purposeful Availment

The First Circuit has instructed that "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Astro-Med*, 591 F.3d at 10 (quoting *N. Laminate Sales*, 403 F.3d at 25). "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach. Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011). The purposeful availment inquiry ensures "that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." *Sawtelle v. Farrell*,

70 F.3d 1381, 1391 (1st Cir. 1995) (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774, (1984)); *accord Adams*, 601 F.3d at 6 ("The focus of the purposeful availment inquiry is the defendant's intentionality").

"The inquiry is 'highly idiosyncratic, involving an individualized assessment and factual analysis of the precise mix of contacts that characterize each case.'" *Cossaboon v. Me. Med. Ctr.*, 600 F.3d 25, 33 (1st Cir. 2010) (quoting *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994)). "The cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." *Sawtelle*, 70 F.3d. at 1391 (citing *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994)).

### i.      Voluntariness

"Voluntariness requires that the defendant's contacts with the forum state proximately result from actions by the defendant *himself*.  The contacts must be deliberate, and not based on the unilateral actions of another party." *Id.* (emphasis in original) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 28 (1st Cir. 2008) (internal citations omitted).

Beginning with Plaintiff's argument regarding Berkshire's revenue derived from polices sold in the state of Maine, the Court notes the First Circuit's admonition that "generally, the jurisdictional contacts of a subsidiary corporation are not imputed to its parent." *Rodriguez-Rivera*, 43 F.4th at 161 (citing *De Castro v. Sanifill, Inc.*, 198 F.3d 282, 283-84 (1st Cir. 1999)).  Mr. Hansen's speculates that "Maine residents account for 1% of the float Berkshire had access to in 2022," *Pl.'s Opp'n* at 4, but ignores the fact that such float does not represent Berkshire's profit from direct

sales of insurance policies in Maine, but rather is provided by GEICO as a surplus of liquidity for investment. As Plaintiff himself stated, GEICO is incorporated in the state of Delaware and has a principal place of business in the state of Maryland. *Corrected Compl.* at 5. As such, the Court does not conceive Berkshire's investment of funds supplied by GEICO to be deliberate and voluntary contact with the state of Maine.

Second, Mr. Hansen asserts "GEICO and Berkshire have an online presence." *Pl.'s Opp'n* at 2. This vague allegation does not come close to meeting the Plaintiff's burden under the *prima facie* to present sufficient evidence, taken as true, to support findings of all facts essential to personal jurisdiction. *Foster-Miller, Inc.*, 46 F.3d at 145. As the First Circuit recently explained in *Chen*, 956 F.3d 45:

> We have made pellucid that "the mere availability" of a defendant's primarily informational website in a forum is insufficient, without more, to subject a defendant to jurisdiction there. *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 61 (1st Cir. 2016). Otherwise, the universality of websites in the modern world would overwhelm constitutional limitations on the exercise of personal jurisdiction. *See Cossaboon*, 600 F.3d at 35.

*Chen*, 956 F.3d at 60. The First Circuit highlighted the lack of evidence in the record that the defendant in *Chen* had "aim[ed] its website specifically" at persons within the forum state, had "derived significant revenue from [forum state]-based individuals through its maintenance of this website," or had solicited the plaintiff's business through this website while the plaintiff was within the forum state. *Id.* For these reasons, the First Circuit concluded "without serious difficulty, that [the defendant] cannot constitutionally be subjected to specific jurisdiction in [the forum state] simply because it operates a primarily informational website that happens to

45

be available there." *Id.* These facts are reminiscent of the record before this Court, which presents no evidence that Berkshire aimed its website specifically at persons within Maine, derived significant revenue from Maine-based individuals through its website, or solicited the Plaintiff's business while he was within Maine.

The *Chen* Court also contemplated the defendant's interactive online platform, which it noted "presents a closer question," noting the First Circuit had previously "upheld the exercise of specific jurisdiction over a foreign corporation in the United States when the corporation used its interactive website to sell its services to customers in the United States and the corporation was aware that it had derived substantial revenue from those sales over the course of several years." *Id.* (for the latter, citing *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 9-10 (1st Cir. 2018)). Ultimately, however, the *Chen* Court concluded "we cannot say that [the defendant] purposefully availed itself of the privilege of conducting business in [the forum state] simply by virtue of maintaining an interactive online [] platform accessible in [the forum state] and all other states." *Id.* at 61.

Here, the Court concludes based on the record before it that Mr. Hansen has failed to present prima facie evidence that Berkshire purposefully availed itself of conducting business in Maine based on his single reference to an online presence. He offers no details on whether Berkshire's purported website was informational or interactive, as would guide the Court's analysis, nor indeed does he even distinguish Berkshire from GEICO in his allegation of "an online presence." *See Pl.'s Opp'n* at 2 ("GEICO and Berkshire have an online presence").

###### ii.        Foreseeability

"Foreseeability requires that the contacts with the forum state be of a nature that the defendant could reasonably anticipate being haled into court there." *Adams*, 601 F.3d at 6 (quoting *World-Wide Volkswagen Corp.*, 444 U.S. at 297) (internal quotation marks omitted).

For the same reasons described above, the Court concludes Mr. Hansen has failed to demonstrate Berkshire could reasonably have foreseen being haled into court in the state of Maine. Berkshire's investment of the insurance float from GEICO, a corporation based in Maryland and Delaware, *Corrected Compl.* at 5, does not provide a basis to anticipate being subjected to a lawsuit in Maine. Further, based on the record before it, the Court cannot reasonably conclude that a general "online presence" would constitute sufficient contacts with the state of Maine to anticipate being subjected to personal jurisdiction in that forum. There is no evidence that Berkshire's website solicited business in Maine or was interactive and Mr. Hansen's engagement occurred in the state of Maine.

At bottom, Mr. Hansen has failed to satisfy his prima facie burden of demonstrating by clear evidence Berkshire's purposeful availment of conducting business in the state of Maine. Based on the failure to prove contacts with the forum state, the Court concludes that it lacks specific jurisdiction over Berkshire in this case, and that it may end its jurisdictional inquiry there. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 621 (1st Cir. 2001) ("there can be no requisite nexus between the contacts and the cause of action if no contacts exist"). However, in an

47

abundance of caution, the Court nonetheless explains why Plaintiff's allegations of forum-state activity are also unrelated to his claim.

### b.    Relatedness of Contacts to Plaintiff's Claims

"[R]elatedness is the divining rod that separates specific jurisdiction cases from general jurisdiction cases . . .. [I]t ensures that the element of causation remains in the forefront of the due process investigation." *Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 714 (1st Cir. 1996) (citing *Ticketmaster*, 26 F.3d at 207). On the relatedness prong, a court considers whether "the claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities." *Astro-Med*, 591 F.3d at 9 (quoting *N. Laminate Sales*, 403 F.3d at 25). The Court applies this "flexible, relaxed standard," *N. Laminate Sales*, 403 F.3d at 25, to Mr. Hansen's case against Berkshire.

As explained, Mr. Hansen bases his assertion of this Court's personal jurisdiction over Berkshire on its "online presence" and its investment of and profiting from insurance float derived from GEICO's sale of insurance policies in Maine. *Pl.'s Opp'n* at 2, 4. However, neither of these activities has any bearing on the claim underlying Mr. Hansen's litigation: Homesite's alleged failure to comply with the payment terms of Mr. Hansen's home insurance policy. In other words, even if the Court accepts Mr. Hansen's arguments as demonstrating Berkshire's purposeful availment of the state of Maine, his claim is in no way related to Berkshire's website, nor does it implicate Berkshire's alleged practice of investing GEICO's insurance float as relevant to his allegations of Homesite's unfair claims practices.

48

Therefore, the Court concludes Mr. Hansen has failed to demonstrate his "claim underlying the litigation directly arises out of, or relates to, the defendant's forum-state activities," *Astro-Med*, 591 F.3d at 9 (quoting *N. Laminate Sales*, 403 F.3d at 25), such that the Court lacks specific jurisdiction over Berkshire in this case. *Accord Swiss Am. Bank Ltd.*, 274 F.3d at 625 (failure to show relatedness ends the specific jurisdiction inquiry). As the Court has determined Mr. Hansen failed to satisfy his burden of proving purposeful availment and relatedness, the Court declines to reach the third factor of reasonableness as unnecessary. *Cf. Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (If purposeful availment and reasonableness are demonstrated, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable") (quoting *Burger King*, 471 U.S. at 477).

### 3. General Jurisdiction

Mr. Hansen also alleges "Berkshire has purposely directed its activities towards residents of the forum (in Maine)," such that the Court has general jurisdiction over it. *Pl.'s Opp'n* at 4. Berkshire cites Mr. Jaksich's declaration, which states Berkshire is incorporated in the state of Delaware; has its headquarters in Omaha, Nebraska; does not maintain an office or own, use, possess, or lease any real property, facilities, or personal property in Maine; does not have any employees, officers, or agents in Maine; does not sell insurance in Maine; is not licensed, registered, or authorized to do business in Maine, nor does it do so; and does not have

a registered agent for service in Maine, nor does it consent to the jurisdiction of the courts of the state of Maine. *Jaksich Aff.* at 1-2.

"For general jurisdiction . . . the defendant must have continuous and systematic contacts with the state . . .[,] the defendant's contacts with the state must be purposeful[, and ] . . . the exercise of jurisdiction must be reasonable under the circumstances." *Lechoslaw*, 618 F.3d at 54 (quoting *Harlow*, 432 F.3d at 57). However, "although minimum contacts suffice in and of themselves for specific jurisdiction under *International Shoe*, the standard for general jurisdiction is considerably more stringent." *Glater v. Eli Lilly & Co.*, 744 F.2d 213, 216 (1st Cir. 1984); *accord Donatelli*, 893 F.2d at 463.

### a.    Continuous and Systematic Contacts

For a court to have general jurisdiction over a foreign corporation, the defendant corporation must have "affiliations with the State [that] are so "continuous and systematic" as to render them essentially at home in the forum State. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe*, 326 U.S. at 317). Here, the Court again considers Mr. Hansen's arguments that this Court has personal jurisdiction over Berkshire based on an alleged "online presence" and its investing of and profiting from GEICO's insurance float derived from sales of Maine insurance policies. *Pl.'s Opp'n* at 2, 4. However, for the same reasons discussed in the context of specific jurisdiction, Mr. Hansen's allegations, unsupported by evidence, fail to satisfy his prima facie burden of demonstrating the Court's jurisdiction over Berkshire.

First, as explained, Berkshire is a separate and distinct legal entity from GEICO, and the precedent of the First Circuit, to which this Court owes its allegiance, mandates that "generally, the jurisdictional contacts of a subsidiary corporation are not imputed to its parent." *Rodriguez-Rivera*, 43 F.4th at 161 (citing *De Castro*, 198 F.3d at 283-84).

Second, while Mr. Hansen imputes Berkshire's investment of insurance float to sales of insurance policies in Maine, he omits the key fact that GEICO is the entity actually selling and profiting from the sale of insurance policies and that GEICO is a corporation at-home in Maryland and Delaware. *Corrected Compl.* at 5. Thus, even accepting Mr. Hansen's inferential deductions regarding Berkshire's investment of GEICO's insurance float as true, this business model does not demonstrate Berkshire's continuous and systematic contacts with the state of Maine.

Third, Mr. Hansen's vague reference to an "online presence" does not persuade the Court that Berkshire is essentially at home in the state of Maine in light of robust First Circuit caselaw on the issue. *See, e.g.*, *Chen*, 956 F.3d at 57 ("We do not discount the possibility that a corporation's pervasive virtual presence in a forum may be the linchpin for a finding that its business contacts are so continuous and systematic as to render it at home in the forum — especially since a corporation, like an individual, may have a number of homes.  But the mere whiff of a virtual presence will not suffice"); *accord Cossaboon*, 600 F.3d at 39 (holding "operat[ing] a website accessible to Maine residents," among other things "fell 'well below the levels of contacts that

have previously been found insufficient to support general jurisdiction'") (quoting *Harlow*, 432 F.3d at 66).

Finally, in light of the First Circuit's instruction that the standard for general jurisdiction based on contacts with the forum state "is considerably more stringent" than specific jurisdiction, *Glater*, 744 F.2d at 216, the Court concludes Mr. Hansen has failed to satisfy of proving by prima facie evidence that Berkshire is subject to the general jurisdiction of this Court. While the Court could end its analysis here, it briefly explains why Mr. Hansen has further failed to demonstrate Berkshire's purposeful availment of the state of Maine.

### b.    Purposeful Availment

As with subject matter jurisdiction, for a court to have general jurisdiction over a defendant, there must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Cossaboon*, 600 F.3d at 32 (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The purposeful availment test "focuses on the defendant's intentionality," *id.* (quoting *Swiss Am. Bank*, 274 F.3d at 623), and "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *Id.* (quoting *Swiss Am. Bank*, 274 F.3d at 624).

The Moving Defendants submit Berkshire is incorporated in the state of Delaware, has its headquarters in Omaha, Nebraska, and does no business in the

state of Maine. *Jaksich Aff.* at 1-2. Mr. Hansen does not dispute this fact and his arguments regarding an "online presence" and Berkshire's investment of GEICO's insurance float derived from Maine sales do not convince the Court that Berkshire should expect to be subject to the jurisdiction of Maine's judicial system. Again, by Mr. Hansen's own admission, GEICO is a corporation at-home in Maryland and Delaware, *Corrected Compl.* at 5, such that Berkshire's investment of GEICO's insurance float does not provide a basis to expect being subjected to a lawsuit in Maine. Further, without further information than a vaguely alleged "online presence," the Court cannot conclude that Berkshire's website, accessible in Maine, would allow Berkshire to reasonable foresee being haled into court in that forum.

For these reasons, the Court concludes it lacks general personal jurisdiction over Berkshire,[9] and grants the Moving Defendants' motion to dismiss Berkshire for lack of personal jurisdiction.

## B.    Motion to Dismiss GEICO[10] for Failure to State a Claim

The Moving Parties' submit that "[b]eyond stating that he bundled his home and auto insurance through 'Geico' and that it and Homesite Insurance Company are affiliates, which they are not, Plaintiff fails to plead any other facts relating to

---

[9]    The Court again declines to reach the reasonableness factors on the basis that, having failed to demonstrate continuous and systemic contacts or purposeful availment, the Defendant need not persuade the Court that its assertion of jurisdiction is nevertheless unreasonable. *See Keds Corp.*, 888 F.2d at 220 (for personal jurisdiction to be unreasonable, a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable") (quoting *Burger King*, 471 U.S. at 477).

[10]    Because the Court is dismissing Berkshire for lack of personal jurisdiction, as explained in the preceding section, the Court considers the Moving Parties' motion to dismiss for failure to state a claim as applicable only to GEICO.

GEICO." *Moving Defs,' Second Mot. to Dismiss* at 14-15.  Mr. Hansen responds Homesite's conduct constituted unfair claims practices in violation of 24-A M.R.S. §§ 2164-D(3)(A-F, I-K); 2164-D(4); 2164-D(5)), and that GEICO acted as an insurance agent, not merely a broker, in its business partnership with Homesite such that it "has a fiduciary duty to procure insurance that the consumer can rely on in the event of a disaster." *Pl.'s Opp'n* at 6-7.   Here, Mr. Hansen says, "GEICO was clearly negligent in not providing me with a homeowners policy that could be relied upon," alleging that GEICO has a monetary incentive to set an "extremely low" bar for "suitable business partners" and citing New Jersey, Louisiana, and Idaho state court decisions that concluded, pursuant to respective state laws, that an insurance agent or broker owed a fiduciary duty to customers to prudently advise their clients. *Id.* at 12-13.

The Moving Defendants reply that GEICO does not meet the statutory definition of insurer under Maine law, that Mr. Hansen has not alleged GEICO was involved in the handling of his insurance claim, and that he makes no allegations of unfair claims practices against GEICO. *Moving Defs.' Second Reply* at 6.  The Moving Defendants apparently concede that GEICO was his insurance agent, *see id.* at 5 ("Despite the fact that Plaintiff acknowledges that . . . GEICO was an agent), but respond to Mr. Hansen's arguments that GEICO owes him a fiduciary duty as his insurance agent by contending an insurance agent "generally assumes only those duties found in an ordinary agency relationship, that is, to use reasonable care, diligence and judgment in obtaining the insurance coverage requested by the insured

party," but does not have "a duty to advise an insured about adequacy of coverage merely because an agency relationship exists between the parties. Before such a duty can arise, a special agency relationship must exist between the parties." *Id*. at 7 (quoting *Szelenyi*, 594 A.2d at 1094). Here, they say, Mr. Hansen has neither alleged nor demonstrated any such special relationship or agreement with GEICO.

In *Szelenyi*, 594 A.2d 1092, the Maine Supreme Judicial Court, sitting as the Law Court, considered a suit against an insurance agent alleging the agent had a duty to advise the plaintiff or to give him information as to the adequacy of his insurance coverage. *See Szelinyi*, 594 A.2d at 1094. On its review of the record, the Law Court concluded that over the twelve-year course of dealing between the parties, "there is no suggestion that they had anything more than an ordinary agency relationship that generally exists between an insurance agent and an insured party" and "decline[d] to sustain a judgment that imposes a legal duty on an insurance agent to advise or give information to an insured party concerning the adequacy of insurance coverage in the absence of evidence of a special relationship or agreement between the parties." *Id*. at 1095.

The Court thus examines the record of this case for evidence that GEICO and Mr. Hansen entered an agreement under which GEICO assumed the duty to advise Mr. Hansen as to the adequacy of his coverage, or that GEICO and Mr. Hansen had a special relationship or agreement between them.

Of all Mr. Hansen's attached exhibits, the only document discussing GEICO is the insurance policy itself. *See Ins. Policy*. This document begins with a letter from

GEICO to Mr. Hansen, thanking him for "purchasing a homeowners policy through the GEICO Insurance Agency, underwritten by **HOMESITE INSURANCE COMPANY OF THE MIDWEST**." *Id.* at 1 (emphasis in original). The document then contains fifty-five pages describing the policy's terms, scope, and specific exclusions. *Id.* at 2-56. However, on this Court's review, nowhere does this document evidence GEICO's agreement to advise Mr. Hansen on the adequacy of the insurance underwriter—here, Homesite—nor does it present evidence that GEICO and Mr. Hansen had a relationship beyond that of a typical insurance agent and insured.

Mr. Hansen directs the Court to state court decisions from New Jersey, Louisiana, and Idaho to support his assertion that GEICO owed him a fiduciary duty and violated that duty by partnering with Homesite, but these decisions do not bind this Court, and indeed interpreted state laws inapplicable in Maine. This Court is instead obligated to follow the Law Court's jurisprudence with respect to Maine state laws. *See, e.g.*, *Norton v. McOsker*, 407 F.3d 501 (1st Cir. 2005) (explaining a federal district court sitting in diversity is governed by state law, which it ascertains by, inter alia, "[r]elying on pronouncements of the state supreme court"). The Law Court has clearly stated that Maine law does not "impose a legal duty on an insurance agent to advise or give information to an insured party concerning the adequacy of insurance coverage in the absence of evidence of a special relationship or agreement between the parties." *Szelinyi*, 594 A.2d at 1095. As Mr. Hansen himself states, "GEICO regularly bundles Homesite homeowners[] policies with its automobile policies," *Pl.'s*

*Opp'n* at 7, such that doing so for Mr. Hansen does not establish a special relationship.

This conclusion is bolstered by the Law Court's decision in *Yankee Pride Transportation & Logistics, Inc. v. UIG, Inc.*, 2021 ME 65, 264 A.3d 1248, in which the Law Court explained, in the context of a claim against an insurance agent, that the "[t]he salient elements of a fiduciary relationship [are] (1) the actual placing of trust or confidence in fact by one party in another, and (2) a great disparity of position and influence between the parties at issue." *Id.*, 2021 ME 65, ¶ 16, 264 A.3d 1248 (quoting *Stewart v. Machias Sav. Bank*, 2000 ME 207, ¶ 10, 762 A.2d 44) (internal quotation marks omitted). However, the *Yankee Pride* Court concluded that the record contained "no evidence from which a fact finder could find that a fiduciary relationship existed between the parties," citing a District of Maine decision applying the Law Court's two-part test from *Stewart* to conclude an insurance agent did not owe a fiduciary duty to an insured party. *Id.* (citing *Noveletsky v. Metro. Life Ins. Co.*, No. 2:12-CV-00021-NT, 2013 U.S. Dist. LEXIS 83762, at *23-*27 (D. Me. June 14, 2013)).

Notably, though Mr. Hansen does not plainly bring a negligence claim against GEICO, he alleges GEICO was "clearly negligent" in presenting him with a policy from a purportedly disreputable vendor. *Pl.'s Opp'n* at 12. However, the *Noveletsky* Court specifically addresses an analogous negligence claim against an insurance agent for providing allegedly inadequate coverage, explaining that the Law Court has held "[a]part from contractual undertakings between the parties, an agency

relationship, or fraud or misrepresentation, we see no basis upon which to recognize an action for negligence against the seller of a product like insurance for the seller's conduct in advising a purchaser what product to buy." *Noveletsky*, 2013 U.S. Dist. LEXIS 83762, at *27 (quoting *Ghiz v. Richard S. Bradford, Inc.*, 573 A.2d 379, 380-81 (Me. 1990)). The *Noveletzy* Court noted that "[t]he Law Court declined to impose liability on the insurance agent for the [plaintiff's] loss," and thus concluded that "[f]ollowing Maine law, this Court cannot impose any greater liability on [the defendant]." *Id.* at 29-30 (citing *Ghiz*, 573 A.2d at 381). Mr. Hansen has not provided the Court with an adequate evidentiary basis to depart from this precedent here.

Finally, it is true that the Law Court has held "[i]t is the law in Maine that when an insurance broker or agent undertakes to provide insurance for another but fails to do so, the agent is liable in the amount that would have been due if the policy had been obtained." *Bramson v. Chester L. Jordan & Co.*, 379 A.2d 730, 732 (Me. 1977) (citing *Miller v. Liberty Ins. Co.*, 161 Me. 438, 213 A.2d 831 (1965)). However, the Court views this holding as inapposite to Mr. Hansen's case for the fundamental reason that in *Bramson*, the appellant held an existing fire insurance policy worth $12,000 and asked his insurance agent to increase the coverage to $15,000; however, the agent "neglected to place said increase of coverage, and they never notified the Plaintiff that the increase in coverage had not been placed." *Id.* The *Bramson* Court thus considered a situation where the agent "had expressly undertaken to provide coverage," but had entirely failed to do so. *Id.*

That is different in kind from the case at bar, in which Mr. Hansen does not dispute that GEICO, acting as his insurance agent, secured an insurance policy underwritten by Homesite but now argues that Homesite has breached the terms of that contract and GEICO should be held liable for Homesite's breach. The Law Court has held in no unclear terms that "[w]hen an agent is not a party to a contract between the principal and a third party, the agent is not liable to the third party for a breach of that contract." *Cnty. Forest Prods. v. Green Mt. Agency, Inc.*, 2000 ME 161, 758 A.2d 59 (citing *Mueller v. Penobscot Valley Hosp.*, 538 A.2d 294, 299 (Me. 1988)). Mr. Hansen nowhere claims GEICO undertook but failed to procure him insurance coverage or that GEICO is a party to the homeowners insurance contract between himself and Homesite. The Court thus finds Mr. Hansen's claim much closer to *County Forest Products* than to *Bramson*.

At bottom, Mr. Hansen does not allege GEICO played any role in the allegedly unlawful management of his insurance claim and he has presented no evidence that an insurance agent owes an insured party the fiduciary duty to advise the insured party as to the adequacy of insurance coverage in the manner he alleges GEICO breached here. For the foregoing reasons, the Court grants the Moving Defendants' motion to dismiss Mr. Hansen's claims against GEICO for failure to state a claim upon which relief may be granted.

## VI.    CONCLUSION

The Court GRANTS Defendants Berkshire Hathaway Inc.'s and Government Employees Insurance Company's Motion to Dismiss Plaintiff's Amended Complaint for Lack of Personal Jurisdiction and/or for Failure to State a Claim (ECF No. 35).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 7th day of July, 2025